**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

SHIRLEY KATHY REDDEN, )
 )
 Plaintiff, )
 )  Case No. 12-CV-16-JED-PJC
v. )
 )
AETNA LIFE INSURANCE COMPANY, )
 )
 Defendant. )

## OPINION AND ORDER

Plaintiff Shirley Kathy Redden ("Redden") brings this claim to recover benefits and enforce her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). (Doc. 2). Redden claims that Defendant AETNA Life Insurance Company ("Aetna")[1] improperly denied her disability benefits.

Plaintiff has filed a "Motion for Summary Judgment and Brief in Support" (Doc. 31), but the Court will construe this motion as an opening brief, pursuant to the original scheduling order issued by Judge Gregory K. Frizzell. This scheduling order set forth deadlines for the submission of the administrative record ("Record"), Plaintiff's opening brief, Defendant's response brief, and Plaintiff's reply brief.[2] (Doc. 17). The scheduling order explained that "[Fed. R. Civ. P.] 56 is facially inapplicable" to ERISA cases and that Rules 54 and 58, instead, apply. (*Id.*).

A claim to recover unpaid benefits under ERISA is distinct from a typical civil claim. An ERISA claimant does not have a right to a jury trial on her claim to recover unpaid benefits, *Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156, 1162 (10th Cir. 1998), and the court is generally

---

[1] Plaintiff filed a Notice of Dismissal without Prejudice (Doc. 4) on February 2, 2012, notifying the Court that Defendant Dentsply Tulsa Dental Products, LLC, was dismissed from the case.

[2] Plaintiff did not ultimately submit a reply.

limited to the administrative record. *Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002). In cases where the benefits plan provides discretion to a plan administrator, the court must review the decision for arbitrariness and capriciousness. *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231-32 (10th Cir. 2012). Whereas summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact," ERISA cases are, by their very nature, full of factual disputes. Fed. R. Civ. P. 56(a); *see Tinkler v. Level 3 Commc'ns, LLC*, No. 07-CV-0259-CVE-FHM, 2008 WL 199901, at *6-8 (N.D. Okla. Jan. 22, 2008) (discussing the facial incompatibility of Rule 56 and the standard of review for ERISA claims); *Coats v. Reliance Standard Life Ins. Policy*, No. 16-CV-233-TCK-TLW, 2017 WL 5071311 (N.D. Okla. May 18, 2017) (disallowing Rule 56 motions in ERISA cases). Consequently, this Court finds that judgment should be entered in this case pursuant to Rules 54 and 58, not Rule 56.

## I.    Background

During the relevant time period, Redden worked as a Sales Development Representative for Dentsply International, Inc. ("Dentsply"), a dental equipment and consumables producer. As a Dentsply employee, she was eligible for short term disability ("STD") benefits under the Dentsply STD Plan and long term disability ("LTD") benefits under the Dentsply LTD Plan. The STD Plan is a "self-funded" plan that is administered by Aetna. (R. 1, 3; Doc. 13 at 3 of 14). The LTD Plan, in contrast, is underwritten by Aetna; Aetna not only serves as the claims administrator under this plan, it also pays the LTD benefits. (Doc. 13 at 3 of 14).

The "Test of Disability" for the STD Plan is met "if you are not able [to] perform the material duties of your own occupation because of an illness or injury, or because of a pregnancy-related condition." (R. 8). The STD Plan provides that "[y]ou are not performing the material duties of your own occupation if:

- You are only performing some of the material duties of your own occupation; and
- Your income is 80% or less of your predisability earnings solely because of an illness, injury or a disabling pregnancy-related condition." (*Id.*).

One's "own occupation" is defined by the STD Plan as the "occupation that you are routinely performing when your period of disability begins." (R. 19). This occupation is "viewed as it is normally performed in the national economy instead of how it is performed:

- For your specific employer; or
- At your location or work site; and
- Without regard to your specific reporting relationship." (*Id.*).

According to the terms of the LTD Plan, a claimant must meet the following definition of "disabled" to qualify for LTD benefits:

From the date you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:
- you are not able to perform the material duties of your own occupation solely because of: disease and injury; and
- your work earnings are 80% or less of your adjusted predisability earnings

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of:
- disease; or
- injury

(R. 29). One's "own occupation" is defined by the LTD Plan as "the occupation that you are routinely performing when your period of disability begins." (R. 40). One's occupation is "viewed as it is normally performed in the national economy instead of how it is performed:

- for your specific employer; or
- at your location or work site; and

without regard to your specific reporting relationship." (*Id*).

Moreover, in order to qualify for LTD benefits, a claimant must be disabled for a 180-day "elimination period." (R. 30, 1091).

Redden reports suffering from bilateral optical nerve drusen, deafness in her left ear, dyslexia, attention deficit disorder (ADHD), and anxiety disorder. Redden asserts that she was a successful Dentsply employee despite these impairments until approximately 2006, "when the advent of computers and specific production goals with her department started making it difficult for her to perform in a satisfactory manner." (Doc. 31 at 5 of 27). She argues that these changes at work increased her anxiety and caused her to be depressed:

> This was because her vision impairment made it difficult for her to rapidly see the changing screens on the computer and background noise made it increasingly difficult for her to hear her customers, understand them and process the information she was receiving from them. All of this was further complicated by her dyslexia and attention deficit disorder.

(*Id*. at 6 of 27).

In a letter dated March 27, 2006, Redden's supervisor, Tara Brown ("Brown"), notified Redden that her work performance needed "immediate improvement." (R. 1129). The letter suggested that Brown had discussed job performance issues with Redden on two prior occasions in the same month.

In a letter written in August 2006, Brown reiterated her concern regarding Redden's performance and behavior issues. (R. 1128). Brown stated that Redden had been "unable to meet the expectations of any position within the Inside Sales & Service team" and that she had "displayed consistent confusion with policies, procedures, computers, and other daily tasks." (*Id*.). The letter went on to explain that Redden had required repetitive training, which had not resulted in her being able to function successfully in her job—"rather, the confusion has increased." (*Id*.). The Record suggests that Dentsply recommended Redden take time off work in 2006 to address these issues. (R. 1166). There is also some evidence in the Record of hospitalization in 2006 due to possible anxiety. (R. 482).

Brown again raised concerns regarding Redden's work performance in 2008. An April 16, 2008 letter from Brown outlined her observations, including a trend of low call volume, increased order entry errors, long periods of time during the day with no call activity, and feedback that her calls had been confusing and lacking a clear objective. (R. 1126). The letter also stated that Redden had been crying at her desk at least once, that she had been unusually withdrawn from her teammates, and that she had gone home twice unable to continue working those days. (*Id*.). As a result of these problems, Redden was given time off with pay through April 30, 2008, to see a physician and "obtain a determination about meeting the physical and cognitive requirements of [her] position." (R. 1127).

After taking this paid time off, Redden applied for and started receiving STD Plan benefits. (R. 402, 445-46). Aetna initially approved these benefits for May 8, 2008, through June 13, 2008. (R. 445-46).[3] On June 20, 2008, Aetna informed Redden that her claim for an extension of benefits beyond June 13 had been denied. (R. 456). Redden appealed this decision. (R. 462). The appeal process was put on hold several times in order to give Redden additional time to submit medical documentation. (*See* R. 472, 476, 478, 620). In the meantime, Redden's employment with Dentsply was terminated. (R. 522).

On October 9, 2008, Aetna informed Redden that it had overturned its original decision and had approved her request for STD benefits. (R. 633-34). In a letter addressed to Redden, Aetna's Senior Appeals Specialist, Tammy Corbin, stated, "[W]e have determined that sufficient documentation exists which supports an inability to perform your own occupation." (R. 634). Her STD benefits were then extended through October 23, 2008. (R. 637).

---

[3] Aetna certified Redden's disability as beginning on May 1, 2008, but her benefits could only start after a brief waiting period. (R. 446).

Aetna notified Redden on October 27, 2008, that her STD benefits would not be extended beyond October 23, 2008. (R. 661-62). The notification letter asserted that "[t]here was no objective medical information provided to show current restrictions, limitations, and/or impairments that would preclude you from performing your own occupation. (R. 661).

Redden again appealed (R. 682), and Aetna eventually overturned its decision and agreed to pay the remainder of the STD benefits. (R. 685-86). The notification letter, dated April 24, 2009, provided the following explanation:

> Based on our review of the [listed documents], we have determined that sufficient documentation existed to support Ms. Redden's inability to perform her own occupation through the end of benefits for [STD]. The claimant has documentation of multiple medical conditions which need to be evaluated by a physician. Those conditions are hearing, visual, dyslexia, ADHD, anxiety, and cognition problems opined to be related to her hearing and vision impairments.
>
> Ms. Redden will be required to provide updated clinical documentation to support her continued disability. . . .

(R. 686).

## A.    Aetna's Initial Review of Redden's LTD Application

Since Redden had completed the required 180-day elimination period as of October 28, 2008, Aetna began reviewing Redden's claim for LTD benefits. (R. 738, 1091). As part of this review, Aetna had a Vocational Rehabilitation Counselor ("VRC") review Redden's job description to determine the comparable occupation as it exists in the general economy. The VRC concluded that Redden's job most closely aligned with that of a telephone solicitor. (R. 376; *see* Dictionary of Occupational Titles 299.357-014, 1991 WL 672624).

Aetna also hired several physicians to conduct peer reviews of the medical records submitted by Redden. (R. 1074-77, 1079-83, 1085-88, 1102-06, 1108-11). The undersigned will

first discuss some of the key observations and conclusions made by Redden's treating physicians, then summarize the peer review reports submitted to Aetna.

### 1. Medical Records of Treating Physicians

As noted above, one of Redden's claimed impairments involves her eyesight. On July 1, 2008, Dr. Bradley Farris, Redden's treating neuro-ophthalmologist, wrote a letter describing Redden's visual condition. The letter contained the following explanation:

> This it to verify that I have been following Kathy Redden for a number of years with a diagnosis of bilateral optic nerve drusen. That is, she has loss of side vision in certain parts of her visual field bilaterally, more pronounced on the left. She therefore has difficulty being able to see very fine print in a rapid fashion, as it could easily get into her "blind spot" in each eye. An ideal job description for Kathy Redden with her visual problems would not include fine detailed data entry. I expect her problem to remain stable and non-progressive.

(R. 962).

Redden also suffers from hearing loss in her left ear. On July 7, 2008, Dr. Mallory Nitzel, Redden's audiologist, provided the following insights into Redden's hearing and auditory processing:

> Kathy was seen at our office for an Auditory Processing screening. It is a known fact that Kathy has a significant hearing loss in her left ear only and utilizes a hearing aid in that ear. It is understood that people who are hard of hearing, naturally have an auditory processing disorder because they are not getting a clear signal to their brain. Today's testing was to reveal if Kathy has greater than normal difficulty hearing in noise compared to other hard of hearing people. It is already known she has greater than normal difficulty hearing in noise compared to people with normal hearing. . . . Kathy's testing revealed greater than normal difficulty understanding with the background noise when compared to other hard of hearing persons, not to mention people with normal hearing.

(R. 969). Dr. Nitzel specifically recommended that Redden have a quiet work environment "free of ambient noise such as talking, computer printer noise, telephones ringing, etc." (*Id.*). According to Dr. Nitzel, Redden would ideally be in a secluded environment where she could use the speaker phone feature of her work telephone, since a typical, binaural headset would cause feedback with

her hearing aid. Dr. Nitzel also suggested that an FM system could be utilized "to give Kathy a direct connection between her hearing aid and telephone," but this was not recommended as an initial solution. (R. 969).

Redden also submitted a psychological report written by a psychologist, Dr. Larry Vaught. (R. 481-87). Dr. Vaught reported on his direct observations of Redden, as well as the results of several cognitive tests. He observed that that her posture and gait appeared normal, her speed was intelligible and fluent, her thinking was logical and goal-directed, and her affect was appropriate. He further noted that she made good eye contact, was cooperative, and was casually and neatly dressed. Redden's Full Scale I.Q. was in the average range, though she tested in the 18th percentile in processing speed and in the 21st percentile in verbal comprehension. Memory testing showed that she had difficulty with single-trial learning, but that she benefited from repetition. She also obtained a low average score in motor speed, visual scanning, and sequencing. Multiple tests suggested that her processing speed was "probably depressed." (R. 486). Thus, according to Dr. Vaught, Redden "may have difficulty doing more than one thing at a time," and she "may be easily sidetracked or overwhelmed in a busy business environment." (*Id*.).

Moreover, personality testing reflected an anxiety disorder. Dr. Vaught observed that individuals with her personality profile "may think poorly of their abilities," "may feel they cannot cope with ordinary life stressors," and "can be depressed." (R. 485). In fact, her score on a depression inventory suggested the possibility of mild to moderate depression.

In summing up his findings, Dr. Vaught stated, "there are some inefficiencies, such as auditory single-trial learning, complex attention-concentration and processing speed that are all mildly impaired." (R. 486). He noted, however, that anxiety can negatively affect cognitive

functioning and that Redden's "vision and hearing may also contribute to her problems at work." (*Id.*).

Dr. David Jubelirer, Redden's psychiatrist, also provided letters describing Redden's mental condition. In a letter dated June 13, 2008, he wrote that Redden "has significant attentional and cognitive deficits and depression." (R. 972). He added that she "is currently forgetful, sometimes confused, and lacks significant self-esteem to perform daily work effectively." (*Id.*). In a separate letter, dated September 12, 2008, Dr. Jubelirer wrote:

> Kathy was first seen in my office on May 23, 2008 for an initial evaluation of her symptoms which included inattentiveness, very distract[i]ble, disturbance of thought processes, anxiety and depression. Many of the symptoms seemed to surface 2 years ago after a major change in the software and hardware systems were made at work. Kathy has significant dyslexia, sensorineural hearing loss in her left ear and visual impairment in her left eye and had trouble rapidly adapting to the new environment. . . . The workplace had changed, she became overwhelmed, and it became in her eyes a hostile environment and she received poor performance reports. Kathy had managed to find ways to compensate for her disabilities of ADHD, hearing and visual impairments, and dyslexia, but was no longer able to do so effectively.

(R. 547). Dr. Jubelirer went on to explain that "[o]ne on one testing would not be expected to elicit the deficits that appear in the workplace where the noise level and distractions significantly impact her ability to perform." (R. 547-48).

## 2. Peer Reviews Obtained by Aetna

Upon its initial review of Redden's application for LTD benefits, Aetna obtained peer reviews of Redden's medical records by physicians with specialties in psychology, podiatry, orthopedic surgery, otolaryngology, and ophthalmology. Each of these peer reviewers was asked to determine whether Redden had been disabled during the time frame of May 1, 2008, to October 28, 2008. All five peer review physicians, none of whom personally examined Redden,

determined that she was <u>not</u> functionally impaired during this period, despite the fact that Aetna had already concluded that Redden was disabled during that time.

Samuel Winn, M.D., conducted a peer review from an ophthalmological perspective. (R. 1085-88). He reviewed Redden's medical records and spoke with Dr. Farris, Redden's treating neuro-ophthalmologist. Dr. Winn noted that Redden had drusen of the nerve head in each eye, which had produced a field defect in her left eye. He acknowledged that Dr. Farris was of the opinion that Redden had difficulty rapidly reading fine print and psychological testing showed that Redden had depressed processing speed. However, Dr. Winn concluded that the information "fail[ed] to support a functional impairment regarding her job since apparently she was performing her job prior to the 5/1/08 date and her visual problems had been present prior to that time." (R. 1086-87). He opined that if Redden's job actually required rapid scanning, rapid data entry, and rapid reading, then it was "reasonable to consider some limitation on her ability to perform these tasks due to her field defect." (R. 1087).

Ross Clark, M.D., reviewed Redden's records from an otolaryngological perspective and conducted a peer-to-peer consultation with Redden's treating otolaryngologist, Dr. Dobson. (R. 1074-77). Dr. Clark found that the information provided to him failed to support a functional impairment that would preclude Redden from performing her own occupation for the entire time frame of May 1, 2008, though October 28, 2008. He noted that Redden "has normal hearing in the right ear and works on the telephone primarily and should not have difficulty in the right ear to use the telephone." (R. 1076). He suggested that Redden "may have some difficulty processing auditory information" in a noisy environment, and that she "may benefit from an FM system for her hearing amplification and working in an environment with relatively low noise background." (*Id.*).

Lawrence Burstein, Ph.D., completed a psychological peer review. (R. 1102-06). After reviewing Redden's medical records, Dr. Burstein concluded that they did not support a functional impairment from a psychological perspective from May 1, 2008, through October 28, 2008. He explained that while Dr. Jubelirer, Redden's treating psychiatrist, believed Redden required accommodations due to deficiencies in her auditory and visual processing, Dr. Jubelirer "did not provide any examination findings to support that the claimant would have been impaired from any particular task of her occupation during the period under review." (R. 1104). He noted that Redden's auditory and visual processing impairments were tested as mild, and he suggested that such impairments "were likely to be of longstanding duration." (*Id.*).

Dr. Burstein went on to describe the submitted documentation related to the time period after October 28, 2008. He opined that Dr. Jubelirer's notes from this period did "not contain any descriptions of the claimant's observed behavior or measurements of the claimant's cognitive functioning to support that the claimant was impaired from a psychological perspective." (R. 1105). He further opined that the notes from Redden's therapist and from an outpatient program attended by Redden lacked examination findings to support finding her impaired from performing her own occupation.

James Wallquist, M.D., an orthopedic surgeon, also reviewed Redden's records. (R. 1079-83). Dr. Wallquist specifically reviewed medical documentation pertaining to Redden's musculoskeletal issues, including right shoulder pain, right shoulder bursitis, and cervical pain. In his peer review report, Dr. Wallquist opined that the documentation failed to support a functional impairment that would prevent Redden from performing her own occupation from May 1, 2008,

through October 28, 2009.[4]  He further opined that "there was no indication the claimant had any functional impairments referable to the cervical spine or right shoulder from 10/28/08 through present."  (R. 1082).  The Court observes that Redden did not focus on any orthopedic issues in her opening brief or complaint.  (*See* Doc. 2 at 5-6 of 8; Doc. 31).

Lastly, Allan Bernstein, DPM, conducted a podiatric peer review.  (R. 1108-11).  Dr. Bernstein concluded that Redden had a functional impairment from August 18, 2008, until October 1, 2008, and again from November 6, 2008, through November 9, 2008, due to surgical procedures on her foot.  He found no evidence of any functional impairments apart from those dates.  As with the orthopedic issues discussed above, Redden has not suggested in her briefings to this Court that she qualifies for LTD benefits based on a podiatric condition.

### 3.   Aetna's Initial LTD Decision

On August 6, 2009, Redden's LTD application was denied.  (R. 1091).  In a letter addressed to Redden's attorney, Aetna's LTD Analyst summarized the peer review reports and stated that "[i]n order to substantiate functional impairments, [Redden's] providers would need to submit clinical information that indicates specifically why she is unable to perform the core duties of her occupation."  (R. 1094).  According to the letter, such clinical information could include "any cognitive impairment noted in session, specific examples of emotional dys-control in and out of session, behavioral observations including how [your client] present[s] in session to indicate inability to work, results of psychological testing and/or office notes for review as well as clinical information which demonstrates restrictions and limitations that would preclude your client from performing her own occupation."  (R. 1094-95).

---

[4] In context, the Court presumes he intended to write October 28, <u>2008</u>.  This interpretation is supported by Aetna's response brief, which states that Dr. Wallquist found no functional impairment "from May 1, 2008 through October 28, 2008."  (Doc. 32 at 11).

B.    **Aetna's Review on Appeal**

Redden appealed the decision regarding LTD benefits, which led Aetna to obtain five additional peer reviews.

Dr. Robert G. Josephberg, an ophthalmologist, prepared a peer review report dated February 16, 2010.  (R. 1231-37).  As part of the peer review, Dr. Josephberg reviewed sixty-three categories of documents and conducted a peer-to-peer review with Dr. Farris, Redden's treating neuro-ophthalmologist.  Dr. Josephberg made the following observations based on his review of the records and his conversation with Dr. Farris:

> [T]he claimant Ms. Shirley Redden has had visual problems for at least 15 years preceding any reported impairment, and from 10/28/08 going forward, these problems have not changed.  She was capable of doing her own occupation preceding her reported date of going out of work, and based upon the available medical evidence and the conversation with Dr. Farris, there has been no change in any vision for the past 15 years.  Hence, she would not be precluded from her sedentary level job as a Sales Development Representative.  In fact, she is able to read with 20/25 vision in each eye separate, which is excellent vision and should not cause any depth perception or stereopsis problems and certainly not any reading difficulty.  Certainly, her visual field deficit has no bearing on her vision at all, and any problems of vision based upon her retinal and optic nerve findings have nothing to do with her eye.  Any reading deficit could be cerebral in origin and obviously could have been evident for many, many years. . . . She has no new visual or ocular findings for the last 15 years, and her visual field does not impede her vision centrally nor does it come close.

 (R. 1234).  Dr. Josephberg went on to say that "there was no impairment visually except for an inferior altitudinal scotoma in the left eye that would not impair her reading capability, speed or ability to enter any data entry in a computer, certainly no significant problems."  (R. 1235).  He opined that Redden would have no issue reading rapidly and that, based on her records, her vision would be "excellent."  (*Id*.).  Subsequently, Dr. Josephberg concluded that the provided medical information failed to support a functional impairment for the entire timeframe.  (R. 1234-35).

Aetna also obtained a peer review from Dr. Ronald Grossman, an otolaryngologist.  (R. 1225-29).  Dr. Grossman reviewed the same sixty-three categories of documents and conducted a

peer-to-peer review with Dr. Dobson, Redden's treating otolaryngologist. Dr. Grossman provided

the following observations in his peer review report:

> The medical records provided for review fail to support functional impairment for the entire timeframe from an otolaryngology standpoint. The claimant, Ms. Shirley Redden is not impaired from the date of 10/28/08 through the present. She would be able to function in her sedentary level occupation as a Sales Development Representative for Dentsply. The claimant has a unilateral mixed, primarily sensori neural hearing loss substantiated by audiologic analysis. She has normal hearing in her left ear[5] which is clearly sufficient for normal conversation. She has a normal MRI of the brain ruling out an acoustic neuroma or other central auditory gross pathology. From an otolaryngologic perspective (reviewer's specialty) there is no evidence for impairment that would preclude her from her previous occupation. She does have mild evidence of central auditory perception and integration by audiologic testing. The recommendation of [Dr. Dobson] for a FM system and a quiet environment should obviate this difficulty and enable her to return to her former occupation. In total, the medical data reviewed fails to support impairment in that although the claimant would require accommodations . . . , she would not be precluded from her sedentary level job as a Sales Development Representative from the date of 10/28/08 to the present.

(R. 1228).

Aetna also obtained peer reviews from orthopedic (R. 1239-43) and podiatric (R. 1176-81)

perspectives. Neither of these peer review physicians found a functional impairment that would

have precluded her from sedentary work during the relevant time frame.

Lastly, Elena Mendelssohn, Psy.D., provided Aetna with a peer review report from a

psychological perspective. (R. 1164-71). Dr. Mendelssohn reviewed Redden's records and

conducted a peer-to-peer review with Redden's treating providers, Dr. Jubelirer and Dr. Short. Dr.

Mendelssohn came to a split decision, finding that the provided information supported a functional

impairment from February 19, 2009, through February 28, 2009, but that it did not support a

---

[5] Dr. Grossman notes the incorrect ear here, though he correctly identifies Redden's left ear as the ear with moderate-to-severe hearing loss earlier in his peer review report. (*See* R. 1227).

14

functional impairment from October 28, 2008, to February 18, 2009, and from March 1, 2009, through the present.

Dr. Mendelssohn noted that Redden's medical records "suggest a history of attention-deficit hyperactivity disorder, dyslexia, hearing and visual impairment, and learning disability," but that those conditions "reflect longstanding problems as opposed to acute changes in functioning." (R. 1170). "As such," Dr. Mendelssohn observed, "it was unclear how these reported conditions would subsequently affect the claimant's functioning to the degree that she would require accommodations after working for many years." (*Id*.). She opined that the medical records "did not include specific measurements of the claimant's cognitive functioning or direct examples to corroborate the presence of cognitive deficits impacting functioning." (*Id*.).

Dr. Mendelssohn also discussed Redden's reported anxiety and depression, noting that Redden had been hospitalized at Laureate Psychiatric Hospital from February 19 to February 28, 2009, due to suicidal ideation. (*See* R. 698). She observed that Redden had been seeing a therapist since November 2008, but she opined that the therapist "did not provide a clear description of direct and observed behaviors to corroborate impairment in psychological functioning." (R. 1170). She further opined that Redden's former psychiatrist "did not provide specific clinical findings or behavioral observations to corroborate impairment in psychological functioning." (*Id*.). She also noted that Redden had not submitted any documentation from her current treating psychiatrist and that her most recent office visits with her psychologist reported that she was stable on her medications. As a result, Dr. Mendelssohn only found a functional impairment for the period of time during which Redden was hospitalized at Laureate in February 2009. (R. 1170-71).

On March 16, 2010, Aetna notified Redden's counsel that it had completed its review of Redden's appeal and was upholding its original decision. (R. 1149-53). The letter sent to

Redden's counsel summarized the findings of the second group of peer review physicians and adopted their rationale.  (R. 1151-53).

## II.     Standard of Review

"Principles of trust law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  Where a plan grants the administrator discretionary authority to determine eligibility for benefits or to interpret the terms of the plan, the reviewing court must apply an arbitrary and capricious standard of review.  *Foster*, 693 F.3d at 1231-32.  Here, the parties agree that the LTD Plan granted Aetna such discretionary authority and that an arbitrary and capricious standard of review applies.  (*See* Doc. 31 at 16-17 of 27; Doc. 32 at 6-7 of 31).  In reference to the LTD Plan, the contract between Aetna and Dentsply provides:

> Under Section 503 of Title I of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary.  It has complete authority to review all denied claims for benefits under this policy.  In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
> - determine whether and to what extent employees are entitled to benefits; and
> - construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority. It must not abuse its discretion by acting arbitrarily and capriciously.

(R. 75) (emphasis added).

"When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one."  *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).  Instead, the Administrator's decision "will be upheld unless it is not grounded on *any* reasonable basis."  *Id.*  (quoting *Kimber*, 196 F.3d at 1098).

The indicia of arbitrary and capricious decision-making include lack of substantial evidence, mistake of law, bad faith, and conflict of interest. *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]." *Id.* (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (internal quotation marks omitted) (alteration in original). "Substantial evidence requires 'more than a scintilla but less than a preponderance.'" *Sandoval*, 967 F.2d at 382 (quoting *Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991)).

A conflict of interest arises when, as here, a plan administrator both evaluates claims for benefits and pays benefits claims. *Glenn*, 554 U.S. at 112. Such a conflict of interest does not require the district court to shift the burden of proof, but it must "be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Id.* at 115 (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 115). In order to incorporate this factor, the Tenth Circuit has developed a "sliding scale approach" in which the reviewing court decreases the level of deference given in proportion to the seriousness of the conflict of interest. *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008). "The importance [courts] attach to the existence of a conflict of interest is proportionate to the likelihood that the conflict affected the benefits decision." *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).

III.    **Analysis**

A.    **STD Plan Benefits**

In her complaint, Redden included a claim of improper denial of STD Plan benefits. (Doc. 2 at 6 of 8). Specifically, she stated that she seeks "a declaration from this Court that she is entitled to the STD benefit under the Plan issued by Dentsply and administered by Aetna through the initial

26-week elimination period for payment of LTD benefits." (*Id*.). She also stated that she seeks attorney fees and costs related to securing the STD benefits. (*Id*.). However, Redden made no argument regarding the denial of STD benefits in her opening brief. (Doc. 31). Instead, Redden's opening brief, Aetna's response, and the Record all suggest that Aetna overturned its initial decision to cancel Redden's STD benefits and decided to pay the remainder of such benefits through the elimination period. (*See* Doc. 31 at 9 of 27; Doc. 32 at 8 of 31; R. 685-86). The Court therefore finds that Plaintiff has waived or abandoned this claim by not including it in her opening brief. *See Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) (argument insufficiently raised in the opening brief on appeal is deemed waived).

### B.    LTD Plan Benefits

To determine the lawfulness of Aetna's denial of LTD benefits, the Court must "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117. Redden argues that a host of factors in this case weigh in favor of finding Aetna's decision arbitrary and capricious.

Redden first points out that Aetna was operating under a conflict of interest. As discussed above, the Court must consider this as a factor, but its weight depends on "the likelihood that the conflict affected the benefits decision." *Graham*, 589 F.3d at 1358. The Court gives the conflict of interest in this case greater weight because Aetna terminated Redden's disability benefits precisely when she was transitioning from Dentsply's self-funded STD Plan to the LTD Plan underwritten by Aetna.

Moreover, in reviewing Aetna's initial denial of LTD benefits, it is immediately clear that Aetna's rationale—i.e., that Redden was not disabled from May 1, 2008, on—directly contradicts Aetna's earlier conclusions that Redden was disabled from May 1, 2008, through the end of the

elimination period. The Tenth Circuit has explained that a "one-time determination of eligibility for benefits under [a] Plan does not foreclose subsequent principled review." *Kimber*, 196 F.3d at 1098 (not arbitrary and capricious for plan administrator to periodically review claimant's file and request additional evidence of a continuing total disability). For example, in *Meraou v. Williams Co. Long Term Disability Plan*, the claimant had begun receiving LTD benefits in 1992 based on various diagnoses. 221 F. App'x 696, 698 (10th Cir. 2007) (unpublished). Ten years later, when the claimant failed to provide certain updated medical information, the claims administrator terminated her LTD benefits. *Id*. at 699. The Tenth Circuit held that the plan administrator's original determination in 1992 that the claimant was disabled did not prevent it from terminating those benefits when the claimant failed to supply medical records to prove her continued disability. *Id*. at 706. Similarly, in *Loughray v. Hartford Group Life Insurance Co.*, the Tenth Circuit found it reasonable for a plan administrator to decline to find that a claimant remained disabled by a thyroid condition based on stale diagnoses. 366 F. App'x 913, 925 (10th Cir. 2010) (unpublished).

However, when Aetna initially denied Redden's claim for LTD, it was not because Redden had failed to show *continued* disability; instead, as explained above, Aetna's peer review physicians opined that Redden had not been disabled since the beginning of the elimination period. As late as April 24, 2009, Aetna had specifically determined "that sufficient documentation existed to support Ms. Redden's inability to perform her own occupation through the end of benefits for [STD]." (R. 686). It is remarkable that, four months later, Aetna could come to the exact opposite conclusion regarding the same time period—without giving any kind of explanation or even acknowledgment of this contradiction.

The second group of peer reviewers appropriately considered the time period after Redden's STD benefits ended, but their reasoning for finding no functional impairment was still notably weak.

First, Dr. Josephberg, the reviewing ophthalmologist, ignored the explanation given by Redden's treating psychiatrist as to why Redden's pre-existing visual condition could have become more disabling over time. As noted above, Dr. Jubelirer suggested that software and hardware changes at the workplace in 2006 overwhelmed Redden and made it more difficult for her to compensate for her ADHD, dyslexia, and hearing and visual impairments. (R. 547). Yet, Dr. Josephberg reasoned that Redden "was capable of doing her own occupation preceding her reported date of going out of work, and . . . there has been no change in any vision for the past 15 years." (R. 1234). This reviewer did not address Dr. Jubelirer's assertion that the requirements of Redden's own occupation may have changed over time, nor did he consider the evidence in the Record showing that Redden struggled to meet expectations at work prior to 2008. (R. 1128-30). The Court also observes that the initial reviewing ophthalmologist, Dr. Winn, conceded that if Redden's job "actually required rapid scanning, rapid data entry, and rapid reading, then it was reasonable to consider some limitation on her ability to perform these tasks due to her field defect." (R. 1087).

Of course, Redden's own neuro-ophthalmologist clearly believed that her visual condition made it difficult for her to perform fine detailed data entry. (R. 962). Although there is no "treating physician rule" in the ERISA context as there is in Social Security administrative review cases, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Aetna's rationale for finding no psychological functional impairment is similarly weak. Dr. Burstein noted Redden's auditory and visual processing impairments, but concluded that there were no examination findings showing that such deficits "would have impaired [Redden] from any particular task of her occupation." (R. 1104). Here, Dr. Burstein failed to distinguish between Redden's mild cognitive impairments and the mental and emotional impairments caused by them. Dr. Mendelssohn put more focus on Redden's mental and emotion impairments—specifically, her depression and anxiety—but she concluded that Redden's therapist "did not provide a clear description of direct and observed behaviors to corroborate impairment in psychological functioning" and that Redden's psychiatrist "did not provide specific clinical findings or behavioral observations to corroborate impairment in psychological functioning." (R. 1170). Yet the Court found such clear descriptions and findings in the Record; specifically:

- The April 1, 2009 discharge summary from Laureate Psychiatric Clinic and Hospital stating that Redden had been brought in for suicidal ideation and that she "was acting very oddly and screaming, only speaking one word at a time and then being quiet and 'catatonic'" (R. 698); and

- Several progress notes written by Redden's therapist, Ms. Carrie Short, in 2009, with references to Redden feeling overwhelmed (R. 886, 889, 890) and crying (R. 898).

Ms. Short also told Dr. Mendelssohn over the telephone that Redden's anxiety in November 2008 was "out of control" and that Redden was a poor historian secondary to anxiety and had difficulty focusing on a conversation. (R. 1169). The Court finds that the Record was not lacking in clear descriptions of direct and observed behaviors to corroborate a psychological impairment.

For the foregoing reasons, the Court finds that Aetna's decision to deny Redden LTD benefits is not supported by substantial evidence and, instead, was arbitrary and capricious. In

handling Redden's case, Aetna arbitrarily refused to credit Redden's reliable evidence, including the opinions of several treating physicians. *See Black & Decker Disability Plan*, 538 U.S. at 834. Instead, Aetna relied on non-treating, non-examining physicians whose opinions contradicted— without explanation—the opinions of Redden's treating physicians, the observations made by Redden's employer, and Aetna's own prior conclusions regarding Redden's disability. The conflict of interest at play here further tips the balance in favor of Redden.

In terms of a remedy, the Tenth Circuit has given the following guidance in deciding whether to remand a case to the plan administrator or award a retroactive reinstatement of benefits:

> Which of these two remedies is proper in a given case, however, depends upon the specific flaws of the plan administrator's decision. In particular, if the plan administrator "fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision," the proper remedy "is to remand the case to the administrator for further findings or explanation. In contrast, a retroactive reinstatement of benefits is proper where, but for the plan administrator's arbitrary and capricious conduct, the claimant "would have continued to receive the benefits or where there [was] no evidence in the record to support a termination or denial of benefits."

*DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175–76 (10th Cir. 2006) (alterations in original) (citations omitted). Because the Court finds that the Record does not support a denial of LTD benefits, the appropriate remedy in this case is a retroactive reinstatement of benefits.

In its response brief, Aetna argues that if Redden is entitled to benefits, she is only eligible for benefits for twenty-four months. (Doc. 32 at 39 of 31). Aetna points to the LTD Plan's "Mental Nervous Limitation," which states:

> A period of disability will end after 24 monthly benefits are payable if it is determined that the disability is primarily caused by:
> - A Mental Health or Psychiatric condition, including physical manifestations of these conditions, but excluding those conditions with demonstrable, structural brain damages; or
> - Alcohol and/or Drug Abuse.

(R. 30).  Because Redden did not submit a reply brief, she has not objected to Aetna's contention that the Mental Nervous Limitation applies here.  The Court finds that the application of this provision is reasonable, given the emphasis on mental health issues in Redden's medical record and opening brief.  The Court also recognizes that Aetna has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co.*, 489 U.S. at 115.

**IT IS THEREFORE ORDERED** that Defendant's final decision denying Plaintiff's claim for Long-Term Disability benefits is hereby **reversed**.  The parties shall submit to the Court the monthly amounts of LTD benefits due to Redden up to the 24-month limitation.  This information should be provided to the Court by September 17, 2018.  Any motions concerning attorney fees, costs, and interest shall be filed before that time.

**ORDERED** this 17th day of August, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE